**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JACK PITTROF, derivatively on behalf of, DXC TECHNOLOGY COMPANY | |
| Plaintiffs, | Case No.: 1:24-cv-2340 |
| v. | |
| MICHAEL J. SALVINO, JOHN SWEENEY, KENNETH P. SHARP, ROBERT F. DEL BENE, MUKESH AGHI, AMY E. ALVING, DAVID A. BARNES, RAUL J. FERNANDEZ, DAVID L. HERZOG, ANTHONY GONZALEZ, MARY KRAKAUER, KARL RACINE, IAN READ, DAWN ROGERS, MANOJ SINGH, CARRIE TEFFNER, AKIHIKO WASHINGTON, and ROBERT F. WOODS | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| DXC TECHNOLOGY COMPANY, | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Jack Pittrof ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on

behalf of Nominal Defendant DXC Technology Company ("DXC" or the "Company"), file this

Verified Shareholder Derivative Complaint against Defendants Michael J. Salvino ("Salvino"),

John Sweeney ("Sweeney"), Kenneth P. Sharp ("Sharp"), Robert F. Del Bene ("Del Bene"),

Mukesh Aghi ("Aghi"), Amy E. Alving ("Alving"), David A. Barnes ("Barnes"), Raul J.

Fernandez ("Fernandez"), David L. Herzog ("Herzog"), Anthony Gonzalez ("Gonzalez"), Mary

Krakauer ("Krakauer"), Karl Racine ("Racine"), Ian Read ("Read"), Dawn Rogers ("Rogers"),

1

Manoj Singh ("Singh"), Carrie Teffner ("Teffner"), Akihiko Washington ("Washington"), and Robert F. Woods ("Woods") (collectively, the "Individual Defendants" and with DXC, "Defendants") for breaches of their fiduciary duties as directors and/or officers of DXC, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5 promulgated thereunder against Defendants Salvino, Sharp, and Del Bene. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DXC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by DXC's current and/or former directors and officers from May 26, 2021 to May 16, 2024, both dates inclusive (the "Relevant Period").

2.      DXC was formed on April 1, 2017, by the merger of Computer Sciences Corporation ("CSC") and HP Enterprise Services ("HP") (the "HPES Merger"). DXC, a Nevada corporation, describes itself as a "global IT services market leader" that provides "mission-critical IT services that transform global businesses." The Company operates through two segments:

Global Business Services ("GBS") and Global Infrastructure Services ("GIS"). The GBS segment offers services including analytics and engineering, insurance software, and business process and enterprise application strategy services. The GIS segment's portfolio of technology offerings includes technology security, cloud infrastructure and information technology outsourcing services.

3.     However, when the Company was founded, it was not in good shape financially. Defendant Lawrie, DXC's Chief Executive Officer ("CEO") at the time, admitted that the Company was "on the lower end of growth and . . . profitability," and its revenue base already was declining. To remedy this problem, Defendant Lawrie planned to move DXC's revenue base, expand its margins, and grow the Company by: (i) integrating CSC and HP; (ii) cutting costs from the combined business; and (iii) achieving "1% to 2% of revenue growth through acquisitions." According to Defendant Lawrie, if DXC followed this strategic plan, the Company would "begin[] to stabilize," "grow [its] revenue profile," and "change [its] revenue mix over the next three years."

4.     Between 2017 and 2018, DXC acquired eight companies, aiming to increase the Company's top-line revenue trajectory and raise profits while cutting costs and integrating the acquired businesses. However, during DXC's November 2018 Investor Day, Defendant Lawrie admitted that the Company's cost-cutting initiatives went too far and had negatively affected DXC's top-line revenue growth.

5.     In 2019, the Company acquired six additional businesses, including Luxoft Holding Inc. ("Luxoft") for $2 billion. Even after an injection of additional revenue from the 2019 acquisitions, DXC underperformed in 2019, triggering Defendant Lawrie to resign as CEO in September 2019. Defendant Salvino took the helm, promising to bring DXC "into its next phase of growth." Despite analysts depicting 2019 as a time of "multiple revenue and earnings

disappointments and a collapse in the stock price" and that Defendant Salvino "face[d] some stiff headwinds" in his "attempt[] to revive the business," the market thought Defendant Salvino could "drive organic growth" because "a pivot to[ward] growth [wa]s the only way forward."

6.     Shortly after Defendant Salvino became CEO, he characterized DXC, in several earnings conference calls, as a fragmented and complex company that suffered from operational and customer service problems. To remedy these problems, he stated that his focus would be on successfully integrating the Company's various businesses. Specifically, Defendant Salvino noted that the Company had to "focus more on selling integrated solutions" to its customers that "leverage[d] multiple DXC offerings and capabilities" and to "simplify" its "complex" operating model. To this end, the Company's goal under Defendant Salvino "[wa]s to consolidate and further scale [DXC's] delivery operations" and "to streamline [the Company's] offering portfolio."

7.     Defendant Salvino personally noted that DXC had to ensure that it was "combining the capabilities" it had "to compete in the market." Simply put, the Company again needed to spend more resources to better integrate its extensive business portfolio that it had acquired since the Company's founding in 2017 before DXC could focus on bolstering top-line revenue growth.

8.     Indeed, in the Company's annual report filed on Form 10-K with the SEC on June 1, 2020, Defendant Salvino was quoted as saying that DXC was undergoing a "transformation journey" that had already well positioned the Company for future success:

> Our **transformation journey** focuses on three things: **strengthening our customer relationships** and ensuring we are delivering for our customers; **optimizing costs** to better serve our customers by eliminating confusion and complexity; and **seizing the market opportunity** by cross-selling and expanding what we do with our customers across the Enterprise Technology Stack.

9.     However, contrary to these representations, during the Relevant Period, the Individual Defendants made or caused the Company to make statements materially false and

misleading representations regarding DXC's transformation journey, including about DXC's capabilities to integrate the numerous businesses the Company has previously acquired. In reality, when the Individual Defendants boasted about the Company's successful "transformation journey," DXC was only capable of cutting its extensive restructuring and transaction, separation, and integration ("TSI") costs by halting the "transformation" and reducing integration initiatives, which had the damaging effect of causing the Company to defer costs that the Company would eventually need to pay to accomplish a successful restructuring initiative.

10.     The truth began to emerge on August 3, 2022 during an earnings conference call. During the call, Defendant Sharp, who served as DXC's Chief Financial Officer ("CFO") at the time, revealed that "our cost optimization efforts have moved at a slower pace than anticipated as we were thoughtfully building our plan."

11.     Years later, on May 16, 2024, the truth finally fully emerged during an earnings conference call when Defendant Fernandez begrudgingly revealed—at the behest of market analysts—that "***the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth***" because systems were "***never integrated, never deduped***" but were rather a "number of business processes that got stacked on top of each other; [a] number of legal entities." Defendant Fernandez even admitted that the Company was "***a really not fully functional organization***."[1] Furthermore, DXC revealed it would need to spend $250 million more on restructuring.

12.     On this news, the price of DXC common stock dropped by $3.36 per share, or approximately 17%, from a closing price of $19.88 per share on May 16, 2024, to close at a price of $16.52 per share on May 17, 2024.

---

[1] All emphasis herein is added unless otherwise noted.

13.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants misrepresented and/or failed to disclose that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on top of each other" and was "***a really not fully functional organization***;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

15.     The Individual Defendants further breached their fiduciary duties by causing DXC to repurchase its own stock at artificially inflated rates. Indeed, during the Relevant Period, **approximately 81.7 million shares** of DXC common stock were repurchased, costing the Company **over $2.195 billion**. Since the repurchased stock was only worth $16.52 per share, which was the price at close of trading on May 17, 2024, DXC **overpaid by over $846 million.**

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the Individual Defendants' misconduct, which has subjected the Company, its former Chief Executive Officer ("CEO"), its former President, its former Chairman of the Board of Directors (the "Board"), its former Chief Financial Officer ("CFO") and Executive Vice President ("EVP"), and its current CFO and EVP to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the Company's directors' receipt of material benefits in the future, of the substantial likelihood of the directors' liability in this derivative action and of the former CEO's, former CFO's, and current CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, DXC is headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of DXC. Plaintiff has continuously held DXC common stock at all relevant times.

### Nominal Defendant DXC

25.     DXC is a Nevada corporation with principal executive offices at 20408 Bashan Drive, Suite 231, Ashburn, VA, 20147. DXC's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC."

### Defendant Salvino

26.     Defendant Salvino served as the Company's President and CEO from September 2019 until he resigned in December 2023. From December 2023 until March 31, 2024, he served in an advisory role. He also previously served as Chairman of the Board from July 2022, and as a Company director from May 2019 until he resigned in December 2023. According to the Company's Schedule 14A filed with the SEC on June 14, 2024 (the "2024 Proxy Statement"), as of May 31, 2024, Defendant Salvino beneficially owned 257,735 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Salvino owned approximately $4 million worth of DXC stock.

27.     For the fiscal year ended March 31, 2024 (the "2024 Fiscal Year"), Defendant Salvino received $19,821,384 in total compensation from the Company. This included $1,350,000 in salary, $16,575,400 in stock awards, $1,593,000 in non-equity incentive plan compensation, and $302,984 in all other compensation.  For the fiscal year ended March 31, 2023 (the "2023 Fiscal Year"), Defendant Salvino received $20,317,972 in total compensation from the Company. This included $1,298,077 in salary, $17,130,174 in stock awards, $1,620,000 in non-equity

incentive plan compensation, and $269,721 in all other compensation. For the fiscal year ended March 31, 2022 (the "2022 Fiscal Year"), Defendant Salvino received $28,716,680 in total compensation from the Company. This included $1,365,064 in salary, $25,087,727 in stock awards, $2,025,000 in non-equity incentive plan compensation, and $238,889 in all other compensation. For the fiscal year ended March 31, 2021 (the "2021 Fiscal Year"), Defendant Salvino received $21,733,120 in total compensation from the Company. This included $1,250,000 in salary, $15,311,312 in stock awards, $5,000,000 in non-equity incentive plan compensation, and $171,808 in all other compensation.

28.     The Company's Schedule 14A filed with the SEC on June 12, 2023 (the "2023 Proxy Statement") stated the following about Defendant Salvino:

> Mike Salvino serves as Chairman, President and Chief Executive Officer of DXC. He was appointed Chief Executive Officer of DXC in 2019, has been a member of the Board of Directors since May 2019, and became Chairman of the Board of Directors of DXC effective July 2022. Mr. Salvino has expertise in transforming businesses by building better cultures, strengthening customer relationships, and focusing on a company's financial foundation. At DXC he has also focused on reducing debt, better managing capital allocation, and driving growth through expanded margin, earnings per share (EPS) and free cash flow (FCF).

> Prior to joining DXC, Mr. Salvino served as managing director of Carrick Capital Partners from 2016 to 2019. Prior to his tenure at Carrick, from 2009 to 2016, Mr. Salvino served as group chief executive of Accenture Operations, one of Accenture's five businesses, where he led a team of more than 100,000 consulting and outsourcing professionals focused on providing business process outsourcing, infrastructure, security and cloud services to deliver business value and drive productivity and digital improvements for clients. Prior to that, he held leadership roles in the HR outsourcing business at Hewitt Associates Inc. and as president of the Americas Region at Exult Inc.

> Mike is a board member of the Atrium Health Foundation, the largest healthcare system in the Carolinas, where he serves on the Investment Oversight Committee for both the hospital and the foundation. Mr. Salvino graduated from Marietta College with a BS degree in industrial engineering. He is a member of the Board of Visitors of the Duke University Pratt School of Engineering.

Qualifications: Mr. Salvino brings to the DXC Board of Directors extensive experience in the professional services industry, with a robust understanding of DXC's strategy, offerings, enabling technologies, digital transformation, innovation, customers, marketplace dynamics and success drivers. Mr. Salvino has broad experience in workforce transformation, restructuring and building a high-performance culture in a complex global environment, and aligning HR policies and practices to attract, onboard, develop and retain top talent in support of DXC's transformation journey. Mr. Salvino also brings to the Board strong leadership and management experience and public company governance experience. In addition, the Board believes that his expertise and perspective in operations, digital, artificial intelligence and security, and strong international business experience, qualify Mr. Salvino to serve as our Chairman, President and Chief Executive Officer.

### Defendant Sweeney

29.    Defendant Sweeney served as the Company's Vice President of Investor Relations from January 2021 until June 2024.

### Defendant Sharp

30.    Defendant Sharp served as the Company's EVP and CFO from November 2020 until he resigned in June 2023. He subsequently served as an advisor to the Company until September 2023. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Sharp beneficially owned 6,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Sharp owned approximately $93,300 worth of DXC stock.

31.    For the 2024 Fiscal Year, Defendant Sharp received $1,994,548 in total compensation from the Company. This included $362,500 in salary and $1,632,048 in all other compensation.  For the 2023 Fiscal Year, Defendant Sharp received $6,125,834 in total compensation from the Company. This included $690,865 in salary, $4,877,660 in stock awards, $543,750 in non-equity incentive plan compensation, and $13,559 in all other compensation. For the 2022 Fiscal Year, Defendant Sharp received $6,218,999 in total compensation from the Company. This included $722,436 in salary, $4,908,371 in stock awards, $577,500 in non-equity

incentive plan compensation, and $10,692 in all other compensation. For the 2021 Fiscal Year, Defendant Sharp received $2,931,600 in total compensation from the Company. This included $215,385 in salary, $750,000 in bonuses, $1,673,186 in stock awards, $291,000 in non-equity incentive plan compensation, and $2,029 in all other compensation.

### **Defendant Del Bene**

32.     Defendant Del Bene has served as the Company's Executive Vice President and CFO since June 2023. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Del Bene beneficially owned 30,529 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Del Bene owned approximately $474,726 worth of DXC stock.

33.     For the 2024 Fiscal Year, Defendant Del Bene received $6,167,056 in total compensation from the Company. This included $549,327 in salary, $500,000 in bonuses, $4,685,514, $425,120 in non-equity incentive plan compensation, and $7,095 in all other compensation.

34.     The Company's website, as of December 17, 2024, states the following about Defendant Del Bene:

> Rob Del Bene is chief financial officer (CFO) for DXC Technology. He leads all aspects of DXC's worldwide financial operations, including global financial strategy and reporting, general accounting, controllership and investor relations.
>
> Rob is a seasoned financial executive. He joined DXC from IBM where he had an impressive 42-year career serving in various senior finance roles, including most recently as general manager, IBM Technology Lifecycle Services, IBM's $6 billion technology support business. Rob also served as IBM's vice president and controller; general manager, IBM Global Financing; and vice president and treasurer, along with other senior roles.
>
> Rob holds an MBA from Duke University and a BS in accounting from Pace University.

**Defendant Aghi**

35.     Defendant Aghi served as a Company director from April 2017 until July 10, 2023. Defendant Aghi also served as the Chair of the Compensation Committee from August 2019 until August 2021 and served on the Compensation Committee from May 2021 until July 2023.

36.     For the 2023 Fiscal Year, Defendant Aghi received $299,080 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Aghi received $307,975 in total compensation from the Company. This included $109,511 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Aghi received $324,511 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $199,511 in stock awards.

**Defendant Alving**

37.     Defendant Alving served as a Company director from April 2017 until July 2023. Defendant Alving also served as a member of the Nominating/Corporate Governance Committee, as the Chair of the Risk Committee until August 2021, and as a member of the Audit Committee from August 2021 until July 2023.

38.     For the 2023 Fiscal Year, Defendant Alving received $299,080 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Alving received $309,877 in total compensation from the Company. This included $111,413 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Alving received $323,330 in total compensation from the Company. This included $123,819 in fees earned or paid in cash and $199,511 in stock awards.

**Defendant Barnes**

39.     Defendant Barnes has served as a Company director since August 2020. Defendant Barnes also serves as the Chair of the Nominating/Corporate Governance Committee and has been a member of that Committee since 2022 and has been a member of the Audit Committee since 2020. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Barnes beneficially owned 34,600 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Barnes owned approximately $538,030 worth of DXC stock.

40.     For the 2023 Fiscal Year, Defendant Barnes received $305,901 in total compensation from the Company. This included $106,821 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Barnes received $302,268 in total compensation from the Company. This included $103,804 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Barnes received $269,158 in total compensation from the Company. This included $69,547 in fees earned or paid in cash and $199,511 in stock awards.

41.     The 2024 Proxy Statement stated the following about Defendant Barnes:

Mr. Barnes has served as a member of our Board since August 13, 2020. He is the former Senior Vice President, Chief Information and Global Business Services Officer of United Parcel Service, Inc. (UPS), a role he served from 2011 to 2016. From 2005 to 2011, Mr. Barnes served as Senior Vice President and Chief Information Officer for UPS. UPS is one of the world's largest global package delivery companies, a provider of global supply chain management and advanced logistic & health care solutions, and an operator of one of the world's largest airlines. In his role as Chief Information Officer of UPS and a member of the UPS Management Committee, Mr. Barnes was responsible for all aspects of UPS technology utilized in over 220 countries and territories. He also chaired the UPS Information Technology Governance Committee responsible for global technology strategy, architecture, mobility, hardware design, and research and development. In addition, he was responsible for information security, served as Co-Chair of the Enterprise Risk Committee, and was a member of the UPS Corporate Strategy and

the Finance Committees. Prior to serving as a member of the UPS Management Committee, he held a number of key leadership positions throughout his 39-year career at UPS in areas including technology development, operations, UPS airline, international custom house brokerage, mergers and acquisitions, and finance.

Mr. Barnes has also served as Senior Advisor for Bridge Growth Partners LLC (Bridge Growth), a private equity fund, since 2016 and in this capacity serves as a member of the board of directors for several privately held companies in Bridge Growth's technology investment portfolio. Mr. Barnes also served as a director of Hertz Global Holdings, Inc. from May 2016 to August 2021; Ingram Micro Inc., a global technology and supply chain service provider, from June 2014 to December 2016, where he was a member of the Audit Committee and chair of the Technology Committee; and Solace Corporation, a software company, from 2016 to December 2023, where he served on the Audit Committee. Mr. Barnes serves as a director for Syniti, a software and services company, since 2017, where he serves on the Audit and Technology Committees.

Qualifications: Mr. Barnes brings to the DXC Board of Directors robust experience managing information security risks, including an understanding of the information security threat landscape and of DXC's enabling technologies. He also has strong leadership and management experience, including experience in a global organization with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation, and driving results. Mr. Barnes has extensive experience with corporate and board governance, including oversight of compliance, risk, regulatory requirements, and processes to effectively manage and monitor these in support of stockholders' interests. Mr. Barnes also brings to the Board broad experience in the professional services industry, with an understanding of DXC's strategy, offerings, digital transformation, innovation, customers, marketplace dynamics and success drivers, as well as experience and understanding of areas such as accounting policies and standards, financial reporting, disclosure requirements, financial statements, internal controls, audit (internal and external), complex financial transactions, capital allocation, and mergers and acquisitions.

**Defendant Fernandez**

42.     Defendant Fernandez has served as a Company director since August 2020. Defendant Fernandez also serves as the Company's President and CEO since February 2024. Previously, he served as the Company's Interim President and CEO since Defendant Salvino left DXC in December 2023. He also served as the Chair of the Nominating/Corporate Governance Committee from July 2022 until at least July 2023, as a member of the Nominating/Corporate

Governance Committee from at least August 2021 until at least July 2023, and served as a member of the Compensation Committee from August 2020 until August of 2021. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Fernandez beneficially owned 59,492 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Fernandez owned approximately $925,101 worth of DXC stock.

43.    For the 2023 Fiscal Year, Defendant Fernandez received $319,080 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Fernandez received $314,660 in total compensation from the Company. This included $116,196 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Fernandez received $269,158 in total compensation from the Company. This included $69,547 in fees earned or paid in cash and $199,511 in stock awards.

44.    The 2024 Proxy Statement stated the following about Defendant Fernandez:

Mr. Fernandez has served as DXC's President and CEO since February 1, 2024 after serving since December 2023 as DXC's Interim President and CEO. He previously served as a member of our Board of Directors since August 2020.

Mr. Fernandez is Vice Chairman and co-owner of Monumental Sports & Entertainment, a private partnership which owns some of Washington, D.C.'s major sports franchises. Mr. Fernandez brings more than three decades of executive experience scaling innovative and rapidly growing technology companies. He was the founder of Proxicom (NASDAQ: PXCM) , which under his leadership evolved into a prominent early global provider of e-commerce solutions for Fortune 500 companies. Mr. Fernandez guided the growth of Proxicom from its launch in 1991 to public listing in 1999. Proxicom was acquired by Dimension Data (LSE: DDT). From 2000 to 2002, he served as Chief Executive Officer for Dimension Data North America, an information systems integration company, and as a director of its parent company, Dimension Data Holdings Plc, in 2001. He also served as Chairman and CEO for ObjectVideo, a leading developer of intelligent video surveillance software, which was sold to Alarm.com (NASDAQ: ALRM) in 2017.

Mr. Fernandez was also a member of President George W. Bush's Council of Advisors on Science and Technology.

Mr. Fernandez has also served on the board of directors of several public companies, including Broadcom, Inc. from January 2020 to April 2024, GameStop Corp. from April 2019 to June 2021, and Kate Spade & Co. from 2000 until its acquisition by Coach, Inc. in July 2017.

*Qualifications*: Mr. Fernandez is an entrepreneur, investor, executive, and board member who brings to the DXC Board of Directors extensive leadership and management experience, including practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation and driving results. Mr. Fernandez has extensive experience in the technology landscape, with a robust understanding of DXC's strategy, offerings, enabling technologies, digital transformation, innovation, customers, marketplace dynamics and success drivers. Mr. Fernandez also brings to the Board experience with corporate and board governance, including oversight of compliance, risk, regulatory requirements, and policies and processes to effectively manage and monitor these in support of stockholders' interests.

### **Defendant Herzog**

45.     Defendant Herzog has served as the Chair of the Board since December 2023 and has served as a Company director since April 2017. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee since July 2022. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Herzog beneficially owned 66,149 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Herzog owned approximately $1 million worth of DXC stock.

46.     For the 2023 Fiscal Year, Defendant Herzog received $346,825 in total compensation from the Company. This included $147,745 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Herzog received $309,877 in total compensation from the Company. This included $111,413 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Herzog received $329,511 in total

compensation from the Company. This included $130,000 in fees earned or paid in cash and

$199,511 in stock awards.

47.    The 2024 Proxy Statement stated the following about Defendant Herzog:

Mr. Herzog has served as a member of our Board since April 1, 2017, and as independent Chairman of the Board since December 19, 2023. Prior to this, he served as our Lead Independent Director since July 26, 2022. Mr. Herzog served as the Chief Financial Officer and Executive Vice President of American International Group (AIG) from 2008 to 2016. Mr. Herzog served as Senior Vice President and Comptroller of AIG from June 2005 to October 2008, Chief Financial Officer for worldwide life insurance operations from April 2004 to June 2005 and Vice President, Life Insurance from 2003 to 2004. In addition, Mr. Herzog has served in other senior officer positions for AIG and its subsidiaries, including as the Chief Financial Officer and Chief Operating Officer of American General Life following its acquisition by AIG. Previously, Mr. Herzog served in various executive positions at GenAmerica Corporation and Family Guardian Life, a Citicorp company, and at a large accounting firm that is now part of PricewaterhouseCoopers LLP. In addition, Mr. Herzog holds the designations of Certified Public Accountant and Fellow, Life Management Institute. Mr. Herzog is currently also a member of the board of directors and chair of the Audit Committee of MetLife Inc. He previously served as a member of the board of directors of Ambac Financial Group, Inc. from March 2016 to June 2023, and PCCW Limited (Hong Kong) from November 2017 to July 2022.

*Qualifications:* Mr. Herzog has extensive experience and understanding of accounting policies and standards, financial reporting, disclosure requirements, financial statements, internal controls, audit (internal and external), complex financial transactions, capital allocation, and mergers and acquisitions. Mr. Herzog brings more than three decades of life insurance and financial service expertise to DXC, and his financial and international business experience in the oversight of AIG and its subsidiaries uniquely positions him to enhance stockholder value by leveraging his financial and risk management expertise and deep understanding of the insurance business. Mr. Herzog also has broad capital markets and treasury experience as well as enterprise transformation and culture-building experience. In addition, the Board believes that his extensive leadership and management experience qualifies Mr. Herzog to serve as Chairman of the Board.

**Defendant Gonzalez**

48.    Defendant Gonzalez served as a Company director since January 2023. He also

serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as

of May 31, 2024, Defendant Gonzalez beneficially owned 16,200 shares of the Company's

common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Gonzalez owned approximately $251,910 worth of DXC stock.

49.     For the 2024 Fiscal Year, Defendant Gonzalez received $356,942 in total compensation from the Company. This included $117,002 in fees earned or paid in cash and $239,940 in stock awards.

50.     The 2024 Proxy Statement stated the following about Defendant Gonzalez:

Mr. Gonzalez has served as a member of our Board since January 5, 2023. He currently is co-Chief Executive Officer of Cobalt Service Partners since November 2023. He previously served as Executive in Residence for Alpine Investors, a private equity firm, from March 2023 until November 2023. Mr. Gonzalez is a former U.S. Congressman for Ohio's 16th Congressional District in the United States House of Representatives, where he served from 2019 until January 2023. Mr. Gonzalez served on the House Financial Services Committee and the Committee on Science, Space, and Technology. Additionally, he served on the House China Task Force and the Select Committee on the Climate Crisis. His legislative areas of focus included capital markets, financial technology, and climate change while he also proudly served as the Vice Ranking Member of the Diversity and Inclusion Subcommittee on Financial Services.

A graduate of The Ohio State University and Stanford University's Graduate School of Business, Mr. Gonzalez played five seasons in the National Football League where he was a first-round draft pick of the Indianapolis Colts. Upon retiring from the NFL in 2012 and earning his Masters in Business Administration in 2014, Mr. Gonzalez served as the Director of Business Development and Corporate Development for Beneco, Inc. from June 2014 until June 2015, where he was a Board Observer and helped stabilize the business through a change of ownership and multiple CEO transitions. In July 2015, he joined InformedK12 (formerly Chalk Schools) where he served as Chief Operating Officer and led all commercial and business functions for the company until June 2017, helping to triple the size of the business.

*Qualifications:* Mr. Gonzalez brings to the DXC Board of Directors extensive regulatory and policy-making experience in business, government, technology, and public service as well as on ESG matters, including climate-related matters, from his service in the United States House of Representatives. He has experience in workforce transformation, restructuring and building a high-performance culture in a complex large environment, and aligning HR policies and practices to attract, onboard, develop and retain top talent in support of the Company's strategic talent

plan. Mr. Gonzalez also brings to the Board broad leadership and management experience with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation and driving results, as well as experience in the professional services industry, with a good understanding of DXC's strategy, offerings, digital transformation, innovation, customers, marketplace dynamics and success drivers.

**Defendant Krakauer**

51.     Defendant Krakauer served as a Company director from March 2018 until July 2022. She also served as a member of the Risk Committee from at least August 2020 until August 2021 and as a member the Nominating/Corporate Governance Committee from August 2021 until July 2022.

52.     For the 2023 Fiscal Year, Defendant Krakauer received $31,793 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Krakauer received $302,268 in total compensation from the Company. This included $103,804 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Krakauer received $307,451 in total compensation from the Company. This included $107,940 in fees earned or paid in cash and $199,511 in stock awards.

**Defendant Racine**

53.     Defendant Racine has served as a Company director since January 2023. He also serves as a member of the Nominating/Corporate Governance Committee. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Racine beneficially owned 16,200 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Racine owned approximately $251,910 worth of DXC stock.

54.    For the 2024 Fiscal Year, Defendant Racine received $362,098 in total compensation from the Company. This included $122,158 in fees earned or paid in cash and $239,940 in stock awards.

55.    The 2024 Proxy Statement stated the following about Defendant Racine:

Mr. Racine has served as a member of our Board since January 5, 2023. Mr. Racine is the former Attorney General of the District of Columbia. He was sworn in as the District of Columbia's first elected Attorney General in 2015 and was reelected to a second term in 2018, where he served until January 2, 2023. As Attorney General, Mr. Racine was front-and-center on emerging issues that intersect with artificial intelligence, big data, privacy and competition law. He has been a national leader in holding big tech companies accountable and fighting for the privacy rights of consumers. Lawsuits he pioneered as Attorney General have been credited with bringing issues–such as geolocation tracking and inadequate data protection–into the national spotlight and are being replicated by bipartisan attorneys general across the country. Outside of litigation, Mr. Racine has been a vocal advocate calling on tech companies to be responsible content moderators. After the January 6th insurrection, Mr. Racine's advocacy prompted Facebook to take down targeted ads of military tactical gear and weapons accessories until after the inauguration.

Mr. Racine has been a partner at Hogan Lovells LLP since January 2023. He is also a member of the board of directors and chair of the nomination and governance committee of SHF Holdings, Inc., a financial services technology firm that serves the regulated cannabis industry, since January 2023. In 2021, Mr. Racine served as President of the bipartisan National Association of Attorneys General (NAAG). In 2022, NAAG awarded him the highest honor bestowed to a sitting Attorney General—the Kelley-Wyman Memorial Award. Mr. Racine draws on over 30 years of legal and leadership experience. Over the course of his career, he has worked at the D.C. Public Defender Service, where he represented District residents who could not afford a lawyer, served as Associate White House Counsel to President Bill Clinton, and worked on criminal cases and complex civil litigation at private firms. While in private practice, he was elected managing partner of his firm, Venable LLP, and became the first African-American managing partner of a top-100 American law firm.

*Qualifications:* Mr. Racine is a seasoned lawyer and politician who brings to the DXC Board of Directors extensive legal and leadership experience. He brings a diverse perspective to the Board as well as broad regulatory and policy-making experience in government, public service and ESG matters. The Board believes Mr. Racine's legal background can assist in fulfilling the Board's oversight responsibilities as to ESG matters and legal and regulatory compliance and regulatory authority engagement.

**Defendant Read**

56.     Defendant Read has served as Chair of the Board from March 2020 until he retired in July 2022.

57.     For the 2022 Fiscal Year, Defendant Read received $450,088 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Read received $449,384 in total compensation from the Company.

**Defendant Rogers**

58.     Defendant Rogers has served as a Company director since March 2021. She also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Rogers beneficially owned 27,100 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Rogers owned approximately $421,405 worth of DXC stock.

59.     For the 2024 Fiscal Year, Defendant Rogers received $362,410 in total compensation from the Company. This included $122,470 in fees earned or paid in cash and $239,940 in stock awards. For the 2023 Fiscal Year, Defendant Rogers received $299,080 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Rogers received $387,952 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $287,952 in stock awards. For the 2021 Fiscal Year, Defendant Rogers received $7,778 in total compensation from the Company.

60.     The 2024 Proxy Statement stated the following about Defendant Rogers:

Ms. Rogers has served as a member of our Board since March 4, 2021. She is a global human resources executive with more than 35 years of experience in companies large and small, with deep expertise in the United States, Europe and emerging markets. She has built innovative HR organizations and high-impact

teams focused on business outcomes and employee experience and engagement. Ms. Rogers has successfully led executive transitions, culture transformations, and large-scale M&A and business change programs. Ms. Rogers is currently Director of Human Capital at American Securities LLC, where she provides leadership and support to the firm's portfolio of companies in all areas of human capital management. Prior to joining American Securities, she was the Executive Vice President and Chief Human Resources Officer at Pfizer Inc. Ms. Rogers' career with Pfizer spanned more than 20 years across their global businesses, working as a key member of the executive team supporting growth and innovation. Prior to Pfizer, she was Senior Director of Human Resources at Kos Pharmaceuticals, where she established the human resources function and built their commercial organization in preparation for their first product launch and IPO. Ms. Rogers also held human resources positions at Earth Tech and The Ares Serono Group/Serono Diagnostics.

*Qualifications:* Ms. Rogers brings to the DXC Board of Directors extensive experience in workforce transformation, restructuring and building a high-performance culture in a complex global environment as well as aligning HR policies and practices to attract, onboard, develop and retain top talent in support of the Company's strategic talent plan. Ms. Rogers has robust leadership and management experience, including experience in a global organization, with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation, and driving results. She also has strong experience with ESG matters and with corporate governance, including oversight of human capital management and executive compensation practices.

### **Defendant Singh**

61.     Defendant Singh served as a Company director from April 2017 until July 2022. Defendant Singh also served as a member of the Audit Committee and as the Chair of the Nominating/Corporate Governance Committee.

62.     For the 2023 Fiscal Year, Defendant Singh received $31,793 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Singh received $309,877 in total compensation from the Company. This included $111,413 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Singh received $329,511 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $199,511 in stock awards.

**Defendant Teffner**

63.     Defendant Teffner has served as a Company director since April 2022. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Teffner beneficially owned 20,500 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Teffner owned approximately $318,775 worth of DXC stock.

64.     For the 2024 Fiscal Year, Defendant Teffner received $364,098 in total compensation from the Company. This included $124,158 in fees earned or paid in cash and $239,940 in stock awards. For the 2023 Fiscal Year, Defendant Teffner received $347,136 in total compensation from the Company. This included $94,722 in fees earned or paid in cash and $252,414 in stock awards.

65.     The 2024 Proxy Statement stated the following about Defendant Teffner:

Ms. Teffner has served as a member of our Board since April 20, 2022. Ms. Teffner is a strategic, financial, and operational executive with over 30 years of experience assisting consumer product and retail companies to grow their businesses worldwide. Ms. Teffner's career has been marked by leading successful large-scale transformational initiatives thanks to her ability to engage, inspire and lead organizations through significant change. She serves on the boards of directors of BFA Industries since February 2021, of International Data Group (IDG) since December 2021, of Rite Aid since October 2023, and of Amer Sports (Cayman Islands) since February 2024. Prior to that, Ms. Teffner served on the Ascena Retail Group board of directors, first as a member of the board from October 2018 to May 2019 and then as interim executive chair from May 2019 to March 2021. She also served on the GameStop board of directors from September 2018 to June 2021 and on the board of directors of Avaya Holdings from February 2023 to May 2023. Before her most recent board roles, Ms. Teffner was at Crocs for four years, where she served as EVP of Finance and Strategic Projects from August 2018 to April 2019, as EVP and Chief Financial Officer from December 2015 to August 2018, and as a member of the board of directors from June 2015 to December 2015. Prior to Crocs, she was the EVP and Chief Financial Officer of PetSmart, a Fortune 300 company, from June 2013 to June 2015. Prior to that, Ms. Teffner was the EVP and Chief Financial Officer of Weber Stephen Products from October 2011 to May 2013 and the Chief Financial Officer of Timberland from September 2009 to September 2011. Ms. Teffner spent the first 21 years of her career with Sara Lee

Corporation, a Fortune 100 company, where she held various domestic and international roles, including division and segment Chief Financial Officer roles and Corporate Treasurer.

*Qualifications:* Ms. Teffner brings to the DXC Board of Directors extensive leadership and management experience, including experience in a global organization with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation, and driving results. She has a robust understanding of accounting policies and standards, financial reporting, disclosure requirements, financial statements, internal controls, audit (internal and external), complex financial transactions, capital allocation, and mergers and acquisitions. Ms. Teffner also brings to the Board extensive experience in workforce transformation, restructuring and building a high-performance culture in a complex global environment, as well as broad capital markets and treasury experience. She also has experience managing information security risks, including an understanding of the information security threat landscape.

**Defendant Washington**

66.    Defendant Washington has served as a Company director since March 2021. Defendant Washington also serves as a member of the Nominating/Corporate Governance Committee and as the Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Washington beneficially owned 27,100 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Washington owned approximately $421,405 worth of DXC stock.

67.    For the 2024 Fiscal Year, Defendant Washington received $391,098 in total compensation from the Company. This included $151,158 in fees earned or paid in cash and $239,940 in stock awards. For the 2023 Fiscal Year, Defendant Washington received $324,080 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Washington received $403,441 in total compensation from the Company. This included $115,489 in fees earned or paid in cash and

$287,952 in stock awards. For the 2021 Fiscal Year, Defendant Washington received $7,778 in total compensation from the Company.

68.    The 2024 Proxy Statement stated the following about Defendant Washington:

Mr. Washington has served as a member of our Board since March 4, 2021. He retired from Warner Bros. Entertainment as Executive Vice President of Worldwide Human Resources, where he served in that role from 2009 until December 2020 and was responsible for managing the company's global HR department, including organizational planning and development, recruitment, compensation and benefits, employee training and development, employee relations, employee communications, inclusion and belonging, shared services and work-life initiatives. He joined Warner Bros. in 2000 as Senior Vice President of Worldwide Human Resources. Mr. Washington is a proven leader in shaping cultures and human resources initiatives globally. His professional experience spans serving as Vice President of Human Resources at Time Warner and 15 years as Vice President of Human Resources at HBO.

*Qualifications:* Mr. Washington brings to the DXC Board of Directors extensive experience in workforce transformation, restructuring and building a high-performance culture in a complex global environment, as well as in aligning HR policies and practices to attract, onboard, develop and retain top talent in support of the Company's strategic talent plan. Mr. Washington has robust leadership and management experience, including experience in a global organization with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation, and driving results. He also has strong experience in the professional services industry, with a good understanding of DXC's strategy, as well as experience with ESG matters and with corporate governance, including oversight of human capital management and executive compensation practices.

**Defendant Woods**

69.    Defendant Woods has served as a Company director since April 2017. Defendant Woods also serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of May 31, 2024, Defendant Woods beneficially owned 56,831 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2024 was $15.55, Defendant Woods owned approximately $883,722 worth of DXC stock.

70.     For the 2024 Fiscal Year, Defendant Woods received $396,419 in total compensation from the Company. This included $156,479 in fees earned or paid in cash and $239,940 in stock awards. For the 2023 Fiscal Year, Defendant Woods received $329,080 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $199,080 in stock awards. For the 2022 Fiscal Year, Defendant Woods received $317,051 in total compensation from the Company. This included $118,587 in fees earned or paid in cash and $198,464 in stock awards. For the 2021 Fiscal Year, Defendant Woods received $299,511 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $199,511 in stock awards.

71.     The 2024 Proxy Statement stated the following about Defendant Woods:

Mr. Woods has served as a member of our Board since April 1, 2017. Mr. Woods served as Senior Vice President of Finance and Chief Financial Officer of SunGard Data Systems, Inc. from 2010 to 2012. Prior to that, from 2004 to 2009, Mr. Woods served as Senior Vice President and Chief Financial Officer of IKON Office Solutions, Inc., a document management systems and services public company. Mr. Woods also served as Vice President and Controller of IBM Corporation from 2002 to 2004 and Vice President and Treasurer of IBM Corporation from 2000 to 2002. He served on the board of directors and the Audit Committee of Computer Sciences Corporation from 2015 to 2017. Mr. Woods also served as a director of Insight Enterprises, Inc., from 2009 to 2011 and as a member of its Audit and Compensation Committees.

*Qualifications:* As the former Chief Financial Officer of two publicly traded companies and having served as an audit committee member of two other publicly traded companies, Mr. Woods brings to the DXC Board of Directors extensive financial experience globally including raising funds in the debt and equity markets, managing liquidity, and managing the complex interplay of operational performance, rating agencies and stockholder relationships. He has strong leadership and management experience, including experience in a global organization, with practical skills and insights around setting business strategy, overseeing operations, driving cost leadership, facilitating change management, leading transformation, and driving results. Mr. Woods also brings to the Board public company governance experience and robust experience and understanding of areas such as accounting policies and standards, financial reporting, disclosure requirements, financial statements, internal controls, audit (internal and external), complex financial transactions, capital allocation, and mergers and acquisitions.

**RELEVANT NON-PARTIES**

**<u>Confidential Witnesses</u>**

72.     As mentioned above, the Securities Class Action interviewed seventeen current and former employees[2] at DXC who had intimate knowledge of the affairs of the Company and whose knowledge demonstrates that the Defendants were materially misrepresenting the state of the Company to the investing public.

73.     FE-1 worked as a manager in the Company's Security division from fall 2021 through summer 2024. In their role, FE-1 was responsible for designing the Security division's product management, portfolio sales, and development of marketing materials.

74.     FE-2 worked as a member of the Company's Cloud and ITO division from 2022 through the end of 2023. FE-2's group reported up through several managers during FE-2's tenure including Directors Ryan Schoenfeld and Steve Hammond. FE-2 was involved in GIS's sales operations.

75.     FE-3 worked in the Company's Modern Workplace division, including as Lead Architect and was tasked with developing the Modern Workplace offerings portfolio.

76.     FE-4 worked as an account manager in the Company's Consumer and Retail division from early 2022 through the conclusion of the Relevant Period.

77.     FE-6 worked as a manager in the Company's Aerospace, Defense, and Manufacturing division from 2021 through 2023. FE-6 was responsible for selling the Company's aerospace, defense, and manufacturing solutions to customers globally.

---

[2] All confidential witnesses are referred to using gender-neutral pronouns to protect their anonymity.

78.     FE-7 worked as Enterprise Account Manager in the Company's Insurance division from 2022 through mid-2023.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

79.     By reason of their positions as officers, directors, and/or fiduciaries of DXC and because of their ability to control the business and corporate affairs of DXC, the Individual Defendants owed DXC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DXC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DXC and its shareholders so as to benefit all shareholders equally.

80.     Each director and officer of the Company owes to DXC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

81.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of DXC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

82.     To discharge their duties, the officers and directors of DXC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

83.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of DXC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of DXC's Board at all relevant times.

84.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

85.     To discharge their duties, the officers and directors of DXC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of DXC were required to, among other things:

        (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Virginia, and the United States,

and pursuant to DXC's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how DXC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of DXC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DXC's operations would comply with all applicable laws and DXC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

86. Each of the Individual Defendants further owed to DXC and the shareholders the duty of loyalty requiring that each favor DXC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

87. At all times relevant hereto, the Individual Defendants were the agents of each other and of DXC and were at all times acting within the course and scope of such agency.

88. Because of their advisory, executive, managerial, directorial, and controlling positions with DXC, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

89. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DXC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

91. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

92.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of DXC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

93.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DXC and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *History and Operations of DXC*

95.     DXC is a Nevada corporation based in Ashburn, Virginia that provides companies with the tools and resources needed to run their mission critical systems and operations while modernizing IT, optimizing data architectures, and ensuring security and scalability across public, private and hybrid clouds.  DXC calls this collective activity on its customers' IT systems the "Enterprise Technology Stack."

96.     Founded on April 1, 2017, through the merger of CSC and HP-ES, DXC has since acquired numerous other businesses and operations systems to further grow the Company's abilities and market share. Today, the Company boasts more than 130,000 employees across more than 70 countries.

97.     During the Relevant Period, DXC's business was divided into two "reportable segments": (1) Global Business Services ("GBS"); and (2) Global Infrastructure Services ("GIS"). The Company's clients in both segments featured businesses across the defense, transportation, financial, healthcare, manufacturing, travel, and hospitality industries.

98.     At first, the Company faced difficulties integrating the companies it had acquired, and, as a result, often faced large restructuring and TSI costs. For instance, for the fiscal year ending March 31, 2018, DXC reported $803 million in restructuring costs.

99.     In September 2019, Defendant Salvino was appointed CEO. At this time, Defendant Salvino initiated a "Transformation Journey" strategy for DXC. The Transformation Journey primarily focused on "[o]ptimizing value to better serve our customers by eliminating confusion and complexity" and "[u]nlocking value by pursuing strategic alternatives, rationalizing our portfolio, and strengthening our balance sheet through our commitment to running a long-term

sustainable business." One of the main objectives of the Transformation Journey was to successfully cut restructuring and TSI costs so that DXC could position itself for sustainable growth moving forward. Specifically, by the beginning of the Relevant Period, DXC had represented that CSC and HP had been successfully integrated and that DXC was turning its attention to finishing the integration of the 12+ businesses it had acquired with the aim of generating growth in revenue organically.

100.    Throughout the Relevant Period, the Individual Defendants repeatedly represented that DXC was successfully implementing the Transformation Journey and that the Transformation Journey itself was a vital priority to them. To this end, in 2021, DXC began including discussions of the "Transformation Journey" in the Company's annual reports filed on Form 10-K as well as the Company's proxy statements filed on Schedule 14A, which certain of the Individual Defendants signed and/or solicited. For instance, the proxy statement filed on June 13, 2022 with the SEC ("2022 Proxy Statement") stated that DXC's "highest priority" "was to work together as one team to execute the Transformation Journey turnaround strategy."

101.    Taking things a step further, the Individual Defendants represented that the Transformation Journey was successful by causing DXC to report lower costs for TSI and restructuring, along with a resulting increase in cash flow, as the scheme went on. The Individual Defendants directly attributed DXC's better performance to the Transformation Journey succeeding.

102.    In furtherance of the scheme, the Individual Defendants caused the Company to repurchase its own stock at artificially inflated rates after representing that the Company's stock as "undervalued." Indeed, during the Relevant Period, *approximately 81.7 million shares* of DXC common stock were repurchased, costing the Company *over $2.195 billion*. Since the repurchased

stock was only worth $16.52 per share, which was the price at close of trading on May 17, 2024, DXC **overpaid by over $846 million.**

103.     By repeatedly publicly representing to the market that DXC had successfully executed the Transformation Journey turnaround strategy and using a robust repurchase program to thicken the veneer of strength and stability, the Individual Defendants artificially pumped up the price of the Company's stock for their own immediate personal benefit, to the detriment of DXC itself.

104.     Indeed, during the Relevant Period, the Individual Defendants paid themselves handsomely while breaching their fiduciary duties to DXC. As noted above, several of the Individual Defendants who served on the Board received hundreds of thousands, and in some instances, millions of dollars in compensation, after shareholders approved officers and directors' compensation plans pursuant too false and misleading proxy statements, which certain Individual Defendants solicited. Yet, these amounts appear tiny compared to the compensation received by certain of the Individual Defendants who served as officers of the Company during the Relevant Period. For example, Defendant Salvino enjoyed more than $90 million in compensation between 2021 and 2023, Defendant Sharp received more than $17 million, and Defendant Del Bene received more than $6 million.

105.     The Individual Defendants enjoyed these personal material benefits as a direct result of their unlawful scheme to cause the Company to repeatedly issue materially false and misleading statements about the implementation and success of the Transformation Journey, while simultaneously concealing the truth about the pervasive disorganization and integration failures that were present at DXC since its founding, among other things.

106. In reality, contrary to the Individual Defendants representations, the Company had not cut TSI costs, but instead abandoned the Transformation Journey entirely while publicly boasting that it was their "highest priority." In so doing, the Individual Defendants disregarded DXC's significant integration needs and caused TSI costs to be artificially reduced. In turn, DXC's free cash flow artificially rose, thereby completing the scheme by making it publicly appear as if DXC had successfully integrated its various component businesses when it had not.

107. As set forth below, multiple of the Former Employees interviewed in the Securities Class Action confirm that the Company's senior management, including Defendants named herein, were aware that DXC was not a successfully integrated company but instead was a mishmash of businesses that competed with each other for the same customers, provided customers with varying prices for the same services, did not receive access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and mothballed certain technology that further inconvenienced customers, among other things.

108. FE-1 maintained that it was common knowledge among Company employees that DXC was not actually interested in properly integrating the various businesses it previously acquired. FE-1 further confirmed that DXC had never even integrated the CSC and HP businesses from the 2017 merger, maintaining that CSC employees were frustrated and complained that they still used their CSC emails and the CSC time sheet system. Upper management at the Company never invested the necessary money to properly integrate the two businesses and lacked even a strategy to integrate them, according to FE-1.

109. Indeed, FE-1 stated that the Company kept the "house of cards" intact by repeatedly laying off employees while publicly representing that DXC had successfully integrated its businesses and reduced TSI costs. The significant reduction in workforce prevented the Company

from having enough qualified employees to run the Company, so much so that DXC had to retain outside personnel to do DXC's work in lieu of DXC employees.

110.   FE-2 corroborated FE-1's assessment, stating that the Company internally had a "Survivor" mentality and chose not to integrate because it was cheaper not to integrate. For instance, FE-2 remembered that when DXC customers wanted a solution to a problem, DXC would have several businesses internally compete to service the customer. This inefficient and cannibalistic practice led at least one customer to tell FE-2 that the Company needed to get its act together.

111.   The decision not to integrate DXC negatively affected customers in other ways as well. For example, according to FE-2, the Company shuttered certain data center sites without providing adequate notice for the customers who used the sites, which significantly inconvenienced the customers and sometimes caused them to leave the Company. FE-2 further stated that the Company would fire top sales personnel that had cultivated relationships with customers and replace them with individuals with less experience.

112.   Regarding efficiency problems, FE-3 maintained that there was "lots of duplication" in the financial and other basic systems across the acquired companies and that the Company took a "hub and spoke approach" instead of acting to prevent duplication because the Company would not spend the necessary money to streamline DXC's financial tools. As a result, according to FE-3, "there was no visibility into cost or billing" because DXC's financial data became so intricate that it could not be properly managed.

113.   FE-4 furthered that the Company did not integrate its acquisitions during FE-4's employment at DXC. FE-4 corroborated FE-2's assessment that certain of DXC's businesses competed with each other, stating that there were several occasions when businesses "did not play

nice together" and were not fully integrated, including CSC, Luxoft, Argodesign, and Molina Healthcare. Several of those companies, including Luxoft, still had their own email addresses, sales teams, clients, pipelines, delivery systems, sourcing, and HR departments, per FE-4. In fact, Luxoft even had their own pay "rate cards" for Luxoft contractor services, leading to DXC customers being quoted different rates to hire a DXC developer versus a Luxoft developer.

114.    Per FE-6, the Company was not integrated, the Company did not invest in integration, and it did not give the funds required to properly integrate the businesses. For instance, Argodesign, which was purchased by the Company in 2018, still retained its own brand identity— even its old logo and stationary. Importantly, Argodesign refused to introduce the Company to its own clients. Similarly, Luxoft still retained its own brand identity when FE-6 was hired in 2021.

115.    FE-7 represented that after the merger of HP and CSC, employees from each company still operated as separate teams. Even five years after the merger, in 2022, there was still talk of integrating HP and CSC, which were referred to internally as "Team Green" and "Team Red," respectively, but no steps actually were taken to integrate these businesses. This was true even after Defendant Salvino spoke of the need to integrate Team Red and Team Green at DXC's internal Insurance Group conference in Charleston, South Carolina, in the spring of 2022. FE-7 recalled there was no follow through after the meeting to integrate the HP and CSC businesses and that workflows remained disparate. For example, HP and CSC used DXC's CRM system, Salesforce, in completely different ways.

**False and Misleading Statements Made During the Relevant Period**

*May 26, 2021 Earnings Conference Call*

116.     The Relevant Period begins on May 26, 2021 when DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the fourth quarter of the 2021 Fiscal Year.

117.     During this call, Defendant Sharp emphasized cuts in DXC's restructuring and TSI expenses as a driver for bolstering the Company's cash flows, stating: ""Fourth, we will reduce restructuring and TSI expense to approximately $550mm in FY'22 to under $100 million in FY'24, ultimately, improving cash flow." He elaborated:

> *One of our key initiatives we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs*. Since DXC was formed 4 years ago, we had significant cash outflows with approximately $900 million in expense per year on average. In FY 22, this will be reduced to approximately $550 million, with a larger portion being allocated to facilities restructuring efforts to improve the work experience for our people as we reshape our portfolio for our virtual model.

*June 27, 2021 Investor Day*

118.     On June 17, 2021, the Company held can Investor Day conference for analysts and investors. During the financial part of the Investor Day presentation, Defendant Sharp addressed "how [DXC] intend[ed] to drive cash." Specifically, Defendant Sharp confirmed that "we have an unyielding focus on reducing restructuring and TSI expenditures."

119.     During the Q&A part of the conference, Lisa Ellis, an analyst from Moffett Nathanson, asked Defendants Salvino and Sharp the following question:

> . . . . I had a couple of questions on the free cash flow outlook. Thanks for the additional detail and focus there. It's like the lynchpin of the FY 2024 outlook. Two things. Ken, these are for you, I'll just ask them both upfront. First, you highlighted reducing TSI and restructuring as the primary lever of free cash flow improvement over the next couple of years. Can you just give a bit more color on what you're

doing to reduce that line item like specifically what's different or maybe what you are stopping doing that you were doing before? . . .

120.   Defendant Salvino replied:

Lisa, thanks for the question. And I'm going to take the first one on restructuring and TSI. Ever since I've sat in the seat as CEO, this has been a – something of a thorn on our side. Right? So when you look at what we did last year, around $900 million of restructuring and TSI, we're basically pretty much cut [that] in half. ***And the focus there is around making sure that any integration that we've done we're absolutely just going to make through that, look, it's done [i]n the appropriate way and move on from there.*** The restructuring, we're very focused on the real estate stuff. So, the plans underneath these numbers now are very detailed as it relates to how we're going to go from $900 million to $550 million and then ultimately to $100 million and look like our peer group again as it relates to restructuring and TSI. So, those were the comments I would make on that. . . .

121.   Defendant Sharp replied:

Wonderful, Mike. Thank you. So, Lisa, I'd just maybe touch on the TSI and restructuring. And Michael Corcoran is on the call as well and you will likely know this, but Michael runs our M&A process. ***And he's been working through each and every open WBS code on TSI. And literally, we've been going through and evaluating and ending those projects and shutting them down, getting them completed and getting them to the right results.*** So, you'll see that – you'll see TSI expense continue to decline as we kind of move on through the current fiscal year. So, I think that's a great result.

Mike is incredibly focused. I think it was my – probably my priorities that you gave me. I think it was number three coming in. ***So, certainly, we've been drilling into them. I do think we'll have a good outcome with it.*** And you said Lisa, I just want to make sure I get words right. But I think you were talking about our main lever. I would say we've got a lot of levers on cash flow. My list I put in there I would say is somewhat indicative. And we're going to work all of these together.

***August 4, 2021 Earnings Conference Call***

122.   On August 4, 2021, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the first quarter of the 2022 Fiscal Year. During the call, Defendant Sharp stated that the Company had "[r]estructuring and TSI expenses [of] $76 million [for FY1Q22], down 58% from prior year." Regarding cash flow, Defendant Sharp stated the following:

As you likely realize, with Mike's leadership, ***we will continue to make decisions to better position the company for the longer term, creating a sustainable business***. Certain of these decisions impacted cash flow this quarter. As our guidance anticipated, we plan to take certain actions that impacted the Q1 cash flow. We remain on track to deliver our full year free cash flow guidance of $500 million.

123.    Defendant Sharp also stated that the Company's plan to cut restructuring and TSI expenses was a "key initiative" to position the Company to achieve its cash flow targets:

> ***One of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring [and] TSI costs***. We expect to reduce this from an average of $900 million per year over the last four years to $550 million in FY '22 and about $100 million in FY '24.

***September 14, 2021 Citi Global Technology Conference***

124.    On September 14, 2021, Defendant Salvino attended the Citi Global Technology Conference on the Company's behalf. During the conference, Citigroup analyst, Ashwin Shirvaikar, asked Defendant Salvino the following question:

> Yes. So I thought maybe a good first question would be to investors who are just now coming back to the name after maybe a hiatus of a year or 2. It may look to them like DXC is still restructuring the same thing that they saw maybe a couple of years ago. But then, of course, the current management team has achieved a lot in a couple of years. And that's perhaps different partly because I think you're seeking to balance multiple priorities. You're not just focused on cost, for example. So can you maybe speak to the broad approach in terms of clients, employees, the portfolio offering and so on?

125.    Defendant Salvino replied:

> Ashwin, thanks. So look, the approach is this. ***We're running a very structured playbook***. And when I say playbook, it's got 3 phases. ***First phase is over, that's the stabilization phase***. ***That was done in FY '21, and we say stabilization***. This is where we sought to implement what I call the 5 steps of the transformation journey. Those steps stay the same through each phase. The goals just change in each step. ***So now we're in building the foundation for growth, meaning simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there***.

*November 3, 2021 Earnings Conference Call*

126.    On November 3, 2021, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the second quarter of the 2022 Fiscal Year. During the call, Defendant Sharp stated that the Company had cut restructuring and TSI expenses. He stated the following:

> *A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business*, addressing our outsized cost structure in certain countries and to reduce our facilities footprint to align to our virtual model. We remain on track to reduce restructuring [and] TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024.

127.    Also, during the conference call, Defendant Sharp represented that the Company "continue[d] to deliver on reducing restructuring and TSI expense." Defendant Salvino described the progress as "sustainable," stating the following:

> *The good news is the financial results that Ken just took us through* reduced debt, *shrinking restructuring and TSI costs*, increased margin and EPS *and stronger free cash flow are all sustainable and a result of the operational work we are doing*. This gives us confidence that we will achieve our FY 2024 double-digit margin guidance.

128.    Also, during the call, analyst Ashwin Shirvaikar questioned the Company's plan to reduce restructuring and TSI costs:

> . . . . And then restructuring [and] TSI, as I sort of look at what you've done year-to-date and the full year projection, it would seem like the current level probably be maintained for the next couple of quarters. I just want to make sure that's accurate and what leads to sort of the quarter-to-quarter step up, step down. Any particular call outs on what you're specifically doing there? Sorry, if I missed that.

129.    Defendant Sharp responded:

> Yeah. We've guided the $550 million for the full year. We're running probably a little bit light of that at this point. What I would say, Ash, *when we've taken a very disciplined focus effort on every dollar of spend. So we make sure there's business cases, it's being deployed thoughtfully*. So you could see it tick up in the

second half of the year to get to the $550 million, but I would just say, we're working diligently to manage it. So I would say that $550 million is a good number. ***But if we don't need the money, we certainly won't spend it.***

***February 2, 2022 Earnings Conference Call***

130.    On February 2, 2022, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the third quarter of the 2022 Fiscal Year. During the call, Defendant Sharp stated the following about the Company's cash flow:

Clearly, our focus has been on improving our cash flow. Specific to new business, we have been focused on structuring our transactions to have lower capital intensity, potentially trading off revenue in favor of cash flow.

***As you can see from my prior comments, our focus on driving structural changes has improved our ability to generate and hold on to more cash***. Cash flow from operations totaled an inflow of $696 million. Free cash flow for the quarter was $550 million, an increase of $956 million as compared to prior year, and moves our year-to-date free cash flow to $650 million or $150 million above our full year guidance.

131.    Regarding restructuring and TSI expenses, Defendant Sharp stated: "***This quarter, we made particularly strong progress with cash generation and continued reduction of Restructuring and TSI expense.***" He also said the following: "***We also continue to make progress on reducing Restructuring and TSI expense***. This reduction contributed $195 million to cash flow during the quarter as compared to the prior year. Further, this also achieves one of our goals of narrowing the difference between GAAP and non-GAAP earnings."

132.    Defendant Sharp stated the following regarding the Company's announcement during the call to cut its guidance for the 2022 Fiscal Year to $400 million:

To put this all in context, we expect to spend $500 million less on Restructuring and TSI expense than last year, while expanding margins by over 200 basis points. ***Our focus is to embed these types of expenses over time into the normal performance of the business, and believe we have taken significant strides in doing so.***

### May 25, 2022 Earnings Conference Call

133.     On May 25, 2022, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the fourth quarter and full year of the 2022 Fiscal Year. During the call, Defendant Sharp stated the following about the Company's cash flow:

> As Mike mentioned earlier, ***our financial foundation is in a much better place***. ***We achieved a lot in the year***, improving transparency into our performance, strengthening our balance sheet, ***significantly improving free cash flow, reducing restructuring and TSI expense***, and executing on our capital allocation program.

### June 2, 2022 Cowen & Company Technology, Media & Telecom Conference

134.     On June 2, 2022, Defendant Sharp attended the Cowen & Company Technology, Media & Telecom Conference. During the conference, Cowen analyst Bryan C. Bergin questioned the Company's free cash flow and how it planned to bridge the gap between its 2022 Fiscal Year free cash flows and its $1.5 billion guidance for the 2024 Fiscal Year: Bergin asked the following question:

> . . . . Free cash flow, let's move to that. So you touched on 4Q and '22 earlier in your commentary, but let's talk about the bridge forward. So you ended fiscal '22 at $743 million. That did include some notable proactive measures that we had discussed. You're projecting $800 million in fiscal '23, and you affirmed that $1.5 billion, []24 target. As you think about that $743 million to $1.5 billion, what are the biggest swing factors there?

135.     Defendant Sharp replied:

> . . . . So when you think about a bridge, I think there are a handful of items that jump out that are pretty big swingers for us. So certainly, the margin expansion, that's a piece. And then when you think about restructuring and [T]SI, I think we were -- when John [Sweeney] and I first showed up, we had a [b]oard of our big opportunities. Restructuring and TSI with one of $1 billion opportunity.

136.     Defendant Sweeney then interjected and said, "$900 million." Then, Defendant Sharp continued:

> It's probably over $100 million right -- ***so we were trying to sort our way through that and certainly shutting it down***. And it seems like, Brian, it would be so easy

just to stop it, right? It's not as easy as you think unfortunately, because it gets to be the culture. And when you said $900 million, John, it was $900 million on average for every year, DXC is created. ***So literally tackling that. I think we've got about $300 million or more cash improvement that will come out of that, which I think is a positive***. So the margin expansion, restructuring, [T]SI, the other area for me that's a real hard one is the CapEx side. So we'll say CapEx and lease originations because we still debate over what the free cash flow definition is, is a classic we turned the analysis.

137.    Defendant Sharp also stated the following during the conference:

The business historically didn't report organic revenue. They were doing a series of acquisitions. ***A lot of those didn't get integrated in. That's where we think we've got a lot of opportunity in the business, right, continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts***.

***June 13, 2022 Proxy Statement***

138.    On June 13, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods solicited the 2022 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

139.    The 2022 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods to the Board; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

140.    The 2022 Proxy Statement boasted that "We are pleased with the ongoing business momentum that we achieved in fiscal 2022 and with the progress we have made in driving our transformation journey. There is no doubt that DXC is in a better place." The 2022 Proxy Statement also stated DXC has "clear execution on our Transformation Journey."

141.    The 2022 Proxy Statement also discussed the link between the success of the

Transformation Journey and executive compensation in numerous places:

• DXC's executive compensation program reflects our Transformation Journey turnaround strategy and aligns with our pay for performance philosophy.

• Our executive compensation program is structured to align pay with performance by closely aligning leadership's financial interests with the execution of DXC's Transformation Journey turnaround strategy, long-term strategic goals, and value creation for our shareholders.

• We will continue to be responsive to our investors as we seek to maintain a highly performance-based executive compensation program that drives long-term value creation for our stockholders and supports DXC's Transformation Journey.

• We've taken steps to simplify our operating and financial structure, align our executive compensation to our Transformation Journey and improve corporate governance, putting DXC in a better place.

• Our executive compensation program is closely aligned with our strategic priorities, which include attracting and retaining a strong, experienced senior team focused on leading our Transformation Journey turnaround strategy. In alignment with our priorities, our executives are accountable for leading our people-first strategy, strengthening our customer relationships, and profitably and sustainably growing our business.

• Considering Mr. Salvino's strong performance leading the Transformation Journey turnaround strategy and during the COVID-19 pandemic, in fiscal 2022, the Compensation Committee decided to increase his total compensation to bring it into line with the peer group median level, including increasing his base salary by 8%.

142.    Regarding "Risk Oversight," the 2022 Proxy Statement stated the following, in

relevant part:

We believe our Board leadership structure supports a risk-management process in which senior management is responsible for our day-to-day risk-management processes and the Board provides oversight of our risk management. As part of its oversight responsibility, the Board oversees and maintains our governance and compliance processes and procedures to promote high standards of responsibility, ethics and integrity.

In order for us to identify and mitigate our risk exposures, we have also established an Enterprise Risk Management (ERM) function to (1) identify risks in the strategic, operational, financial reporting and compliance domains, for DXC as a whole, as well as for each operating unit, and (2) evaluate the effectiveness of

existing mitigation strategies. The ERM function coordinates and reviews assessments of internal processes and controls for ongoing compliance with internal policies and legal regulatory requirements. The ERM function periodically reports potential areas of risk to the Board and its committees.

In fiscal 2022, our enterprise risk, issue and opportunity management framework was centralized under a single executive owner to facilitate consistent processes, definitions and tools to proactively address operational, financial, compliance and strategic risks, issues and opportunities.

We will continue to evaluate our risk management program and structure in fiscal 2023 to ensure alignment with the Company's strategic and operational risks.

Board Role. The Board has overall responsibility for oversight of risk and assessment of our strategic and operational risks throughout the year on an ongoing basis. Members of senior management regularly report on the opportunities and risks faced by us in the markets in which we conduct business.

Committee Role. In fulfilling its oversight role, the Board delegates certain risk management oversight responsibility to the Board's committees. The committees meet regularly and report any significant issues and recommendations discussed during the committee meetings to the Board. Specifically, each committee fulfills the following oversight roles:

The Audit Committee oversees the accounting, financial reporting processes and related internal control framework of DXC and audits of the Company's financial statements and internal control over financial reporting, and discusses our policies with respect to risk assessment and risk management. The Audit Committee also oversees the Company's enterprise risk management program and ethics and compliance program.

The Compensation Committee oversees succession planning and leadership development as well as compensation plans. The Compensation Committee retains an independent compensation consultant to assist with its oversight responsibilities and to ensure that the compensation and benefit programs are designed in a manner that aligns DXC's executive compensation program with the interests of DXC and its stockholders.

The Nominating/Corporate Governance Committee monitors the risks related to DXC's governance structure and process. The Nominating/Corporate Governance Committee is responsible for overseeing the Board's annual self- evaluation of its performance and overall Board effectiveness, and periodic review and recommendation to the Board of any proposed changes to DXC's significant corporate governance documents. The Nominating/Corporate Governance Committee oversees the Company's Environmental, Social and Governance program and climate risks, and the Information Security program.

143.     Regarding the Code of Conduct, the 2022 Proxy Statement stated the following, in

relevant part:

DXC is committed to high standards of ethical conduct and professionalism, and our Code of Conduct confirms our commitment to ethical behavior in the conduct of all DXC activities and reflects our values. The Code of Conduct applies to all directors, all officers (including our chief executive officer (CEO), chief financial officer (CFO) and principal accounting officer (PAO)) and employees of DXC, and it sets forth our policies and expectations on a number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of DXC and customer property and providing a proper and professional work environment. We maintain a worldwide toll-free and Internet-based helpline – the DXC OpenLine – which employees can use to communicate any ethics-related concerns, and we provide training on ethics and compliance topics for all employees. The DXC OpenLine is administered by a third-party provider. The ethics and compliance function resides in the Ethics and Compliance Office and is managed by DXC's Chief Ethics and Compliance Officer.

For the year ended March 31, 2022, there were no waivers of any provisions of DXC's Code of Conduct for our CEO, CFO or PAO. In the event DXC amends the Code of Conduct or waives any provision of the Code of Conduct applicable to our CEO, CFO and PAO that relates to any element of the definition of "code of ethics" enumerated in Item 406(b) of Regulation S-K, we intend to disclose these actions on our website.

144.   Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on

top of each other" and was "*a really not fully functional organization*;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

145.    The 2022 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

146.    As a result of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods to the Board, thereby allowing them to breach and continue to breach their fiduciary duties to the Company; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

### *November 3, 2022 Earnings Conference Call*

147.    On November 3, 2022, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the second quarter of the 2023 Fiscal Year. During the call, Defendant Sharp stated that "***We continue to tightly manage our restructuring and TSI expenses***. These expenses totaled $57 million in the quarter or $92 million for the first half of the year. We expect to see an uptick in restructuring expense in the second half of the year as we execute on our cost optimization efforts."

### *February 1, 2023 Earnings Conference Call*

148.    On February 1, 2023, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the third quarter of the 2023 Fiscal Year. During the call, Defendant Sharp stated that: "***We continue to tightly manage restructuring and TSI expenses***. These expenses totaled $55 million in the quarter. And year-to-date, restructuring in TSI is $147 million, down $124 million from prior year."

149.    Also, during the call, analyst Bryan Bergin asked about the factors affecting DXC's improved cash flow performance:

> Wanted to start on free cash flow. So Ken, just hoping to dig on the moving pieces here to make sure we understand this for '23 and '24. So can you first talk about some of the factors that drove the strong 3Q performance? Should we expect the continued lumpiness in free cash flow generation going forward? Or does that start to kind of smooth out?. . .

150.    Defendant Sharp stated the following in response to Bergin's question:

> All right. Great, Bryan. And look, if I need to clarify, feel free to jump back in. Look, it's great work from the team, right? We've been at this for a couple of years, right? If you wind the clock back, the business had negative free cash flow. ***We've done a lot of work***. Probably the biggest, you look at it now 2 years in a row of positive cash flow over $600 million. So it's really not lost on us, right? ***A lot of good work from a lot of people across the entire business***.

*The biggest driver, right, if you had to just kind of look holistically at the business has been the focus on driving down the restructuring [and] TSI.* So I think that's been somewhere around $600 million swing, so year-to-year. So I think that's a pretty big piece. And then just this quarter, we had built up some AR. It's a little bit hard to tell on the balance sheet but -- because of FX movements and so forth. But we had built up some AR in the last couple of quarters and brought that back down this quarter to kind of a more normalized level. So really, the team has done a nice job just driving across the business.

### **The Truth Begins to Emerge While False and Misleading Statements Continue**

#### *May 18, 2023 Press Release*

151.    On May 18, 2023, DXC revealed that Defendant Sharp was resigning as CFO, effective June 15, 2023. Despite DXC stating that Defendant Sharp was departing the Company for personal reasons, analysts, including analysts at Wolfe Research, advised that the departure raised "incremental concern" about DXC.

#### *May 18, 2023 Earnings Conference Call*

152.    On May 18, 2023, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the fourth quarter and full year of the 2023 Fiscal Year. During the call, Defendant Sharp stated the following regarding restructuring and TSI expenses: "*We continue to tightly manage restructuring and TSI expense*. Our restructuring and TSI expense was $232 million for the year, $68 million lower than our guide. We have been focused on improving the quality of earnings and limiting this kind of non-GAAP adjustment."

#### *June 12, 2023 Proxy Statement*

153.    On June 12, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods solicited the 2023 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

154.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect Defendants Barnes, Fernandez, Gonzalez, Herzog, Rogers, Salvino, Teffner, Washington, Racine, and Woods to the Board; (2) ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

155.    The 2023 Proxy Statement boasted that "For the past three years, we have been laser focused on delivering on our transformation journey and investing significantly in our culture. I am proud of our results."

156.    The 2023 Proxy Statement also discussed the link between the success of the Transformation Journey and executive compensation in numerous places:

• DXC's executive compensation program reflects our Transformation Journey turnaround strategy and aligns with our pay for performance philosophy.

• DXC's executive compensation program reflects our Transformation Journey turnaround strategy and aligns with our pay for performance philosophy.

• Under Mr. Salvino's leadership, DXC's 3-year cumulative TSR (113.7%) substantially outperformed the median of the GICS 4510 Software and Services industry (25.4%). We believe that this relative outperformance demonstrates the effectiveness of the five steps of our Transformation Journey, which is now embedded in how we operate.

• The Compensation Committee set the performance levels with the timeline for the Transformation Journey in mind. It utilized compound annual growth rates (CAGRs) and corresponding stock price growth hurdles requiring successful execution of steps on the Transformation Journey, as evidenced by significant financial and operating performance achievement and corresponding translation to stock price performance.

157.    Regarding "Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

We believe our Board leadership structure supports a risk-management process in which senior management is responsible for our day-to-day risk-management processes and the Board provides oversight of our risk management. As part of its oversight responsibility, the Board oversees and maintains our governance and

compliance processes and procedures to promote high standards of responsibility, ethics and integrity.

In order for us to identify and mitigate our risk exposures, we have also established an Enterprise Risk Management (ERM) function to (1) identify risks in the strategic, operational, financial reporting and compliance domains, for DXC as a whole, as well as for each operating unit, and (2) evaluate the effectiveness of existing mitigation strategies. The ERM function coordinates and reviews assessments of internal processes and controls for ongoing compliance with internal policies and legal regulatory requirements. The ERM function periodically reports potential areas of risk to the Board and its committees.

In fiscal 2022, our enterprise risk, issue and opportunity management framework was centralized under a single executive owner to facilitate consistent processes, definitions and tools to proactively address operational, financial, compliance and strategic risks, issues and opportunities.

We will continue to evaluate our risk management program and structure in fiscal 2023 to ensure alignment with the Company's strategic and operational risks.

Board Role. The Board has overall responsibility for oversight of risk and assessment of our strategic and operational risks throughout the year on an ongoing basis. Members of senior management regularly report on the opportunities and risks faced by us in the markets in which we conduct business.

Committee Role. In fulfilling its oversight role, the Board delegates certain risk management oversight responsibility to the Board's committees. The committees meet regularly and report any significant issues and recommendations discussed during the committee meetings to the Board. Specifically, each committee fulfills the following oversight roles:

The Audit Committee oversees the accounting, financial reporting processes and related internal control framework of DXC and audits of the Company's financial statements and internal control over financial reporting, and discusses our policies with respect to risk assessment and risk management. The Audit Committee also oversees the Company's enterprise risk management program and ethics and compliance program.

The Compensation Committee oversees succession planning and leadership development as well as compensation plans. The Compensation Committee retains an independent compensation consultant to assist with its oversight responsibilities and to ensure that the compensation and benefit programs are designed in a manner that aligns DXC's executive compensation program with the interests of DXC and its stockholders.

The Nominating/Corporate Governance Committee monitors the risks related to DXC's governance structure and process. The Nominating/Corporate Governance Committee is responsible for overseeing the Board's annual self-evaluation of its performance and overall Board effectiveness, and periodic review and recommendation to the Board of any proposed changes to DXC's significant corporate governance documents. The Nominating/Corporate Governance Committee oversees the Company's Environmental, Social and Governance program and climate risks, and the Information Security program.

158.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

> DXC is committed to high standards of ethical conduct and professionalism, and our Code of Conduct confirms our commitment to ethical behavior in the conduct of all DXC activities and reflects our values. The Code of Conduct applies to all directors, all officers (including our chief executive officer (CEO), chief financial officer (CFO) and principal accounting officer (PAO)) and employees of DXC, and it sets forth our policies and expectations on a number of topics including avoiding conflicts of interest, confidentiality, insider trading, protection of DXC and customer property and providing a proper and professional work environment. We maintain a worldwide toll-free and Internet-based helpline – the DXC OpenLine – which employees can use to communicate any ethics-related concerns, and we provide training on ethics and compliance topics for all employees. The DXC OpenLine is administered by a third-party provider. The ethics and compliance function resides in the Ethics and Compliance Office and is managed by DXC's Chief Ethics and Compliance Officer.

> For the year ended March 31, 2022, there were no waivers of any provisions of DXC's Code of Conduct for our CEO, CFO or PAO. In the event DXC amends the Code of Conduct or waives any provision of the Code of Conduct applicable to our CEO, CFO and PAO that relates to any element of the definition of "code of ethics" enumerated in Item 406(b) of Regulation S-K, we intend to disclose these actions on our website.

159.    Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing

certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on top of each other" and was "***a really not fully functional organization***;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

160.   The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

161.   As a result of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Barnes, Fernandez, Gonzalez, Herzog, Rogers, Salvino, Teffner, Washington, Racine, and Woods to the Board, thereby allowing them to breach and continue to breach their fiduciary duties to the Company; (2)

ratify the selection of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

**The Truth Continues to Emerge as False and Misleading Statements Continue**

***August 2, 2023 Conference Call***

162.    On August 2, 2023, the Company held an earnings conference call for analysts and investors to discuss its financial results for the first quarter of the 2024 Fiscal Year. During the call, the Company reported a significant drop in organic revenue for the GIS segment of -9.9% for the first quarter of the 2024 Fiscal Year due to declines in Cloud ITO and Modern Workplace. The Company further revealed that it would be cutting its 2024 Fiscal Year guidance, including anticipated organic revenue growth rate from a range of negative 0.5% to positive 0.5% to a range of negative 4% to positive 3%, and reducing its expected FCF for the 2024 Fiscal Year from $900 million to $800 million. In a press release published that same day, the Company also revealed negative FCF of $75 million for the first quarter of the 2024 Fiscal Year.

163.    On this news, the price of DXC common stock dropped by $7.97 per share, or approximately 29.44%, from a closing price of $27.07 per share on August 2, 2023, to close at a price of $19.10 per share on August 3, 2023.

164.    Yet, the Individual Defendants continued to make false and misleading statements. During the call, Defendant Salvino tried to mitigate the Company's disappointing financial results as a short-term blip, stating that: "[w]hile the execution of any transformation journey is never a straight line, we feel strongly that we are making the right long-term decisions to position DXC for success."

165.    Also, during the call, an analyst from TD Cowen conveyed "surprise[] the free cash flow view is not reduced even further" and asked the Individual Defendants to explain "the levels that are partly inflating free cash flow" and "what you're doing to support expenses without cutting into the bone."

166.    Defendant Del Bene responded by stating that the Company was "confident" in its FCF guidance because they had "cost reduction plans" in place "that support the . . . reduced [EBIT] margin" and "operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800" million in FCF guidance. Defendant Salvino also stated that the Company was "focused and will continue to focus on [its] expenses," but "there's more room there." He further said that "we think that our cost takeout initiatives will deliver at the same levels of FY23" when DXC reported $737 million in FCF.

167.    Then, another analyst inquired if the Company was "borrowing from next year's potential free cash flow generation by some of the things that you're doing to support the [$]800 [million FCF] target versus a more significant degradation associated with the EBIT line?" Defendant Del Bene replied: "***The answer to that is no. . . . we are not trying to accelerate anything temporarily***." He also said during the call that "we think there are operational improvements that will benefit us over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level." He continued, "[w]e're more focused on just operational discipline and getting to the right levels . . . on a sustained basis."

168.    Also, during the August 2, 2023 earnings conference call, Defendant Salvino stated the following:

> We are actioning the cloud ITO and Modern Workplace offerings of G[I]S, which have been impacted by the slowing IT market and are keeping us from making the

progress we desire. We are still confident that we will stabilize the performance of these two offerings. ***We have made improvements in both leadership and our operating model to grow our company and to be even more competitive. We are managing areas that we can control very well, like free cash flow and restructuring [and] TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results***.

169.     During the call, Zack Ajzenman, an analyst from Cowen, asked why free cash flow

guidance was not cut more given that the guidance was reduced to organic revenue and margins:

. . . And just to follow up on free cash flow and related on margins, I guess given the cut on the revenue and earnings, I guess we're surprised the free cash flow view is not reduced even further. So maybe you can speak to the levels that are partly inflating free cash flow here and maybe what you're doing to support expenses without cutting into the bone.

170.     Defendant Del Bene responded:

Yeah, Zack, this is Rob Del Bene. Thanks for the question. Look, when we take a look at the EBIT margin that we expect to perform at that level for the remainder of the year, take a look at the working capital levers we have taken all together, we are confident that we could achieve this adjusted level of $800 million.

***So we have cost reduction plans that support the EBIT, the margin, the reduced margin, and we have operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800***.

171.     Then, Keith Bachman of BMO Capital Markets, followed up on the inquiry by

asking the following question:

. . . . On the free cash flow to EBIT, I heard the answer to a previous question on why the free cash flow performance is better, some working capital tweaks. And I want to ask it in the context of, are those working capital tweaks, are you sort of borrowing from next year's potential free cash flow generation by some of the things that you're doing to support the 800 target versus a more significant degradation associated with the EBIT line?

172.     Defendant Del Bene responded:

. . . The answer to that is no. I mean, we think there are operational improvements that will benefit us over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level.

*So we are not trying to accelerate anything temporarily. We're more focused on just operational discipline and getting to the right levels, as I said, on a sustained basis.*

**November 1, 2023 Earnings Conference Call**

173.     On November 1, 2023, DXC hosted an earnings conference call with securities analysts to discuss the Company's performance for the second quarter of the 2024 Fiscal Year. During the call, Defendant Del Bene stated: "Restructuring and TSI expense increased to $38 million, with the increase entirely due to the restructuring of facility leases part of our effort to rightsize our facility footprint. *We are tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations*." Then, James Friedman, an analyst from Susquehanna International Group, asked the following question:

> So you've had some impressive accomplishments in especially the free cash flow and the free cash flow per share. I was wondering if you could kind of unpack how you're achieving that, Rob, because it really stands out on both the numerator and denominator.

174.     Defendant Del Bene replied:

> . . . One of the -- there are several -- as you would imagine, there are several factors that contribute to the free cash flow performance. It starts with the value delivered by the teams and the offerings that we have, the profitability of those offerings.
>
> *Another big contributor is a significant cost reduction activities [sic] that the teams have embarked on. And last year, they were very successful in achieving the cost reduction goals this year. We're on track with our cost reduction goals, and that will continue*.

175.     Later in the call, Rod Bourgeois from DeepDives asked the following question:

> . . . So thanks to Rob for outlining the free cash flow drivers to get you to the $800 million target.
>
> That's clearly the key metric here. I want to ask another question about free cash flow kind of from a different angle. Clearly, the industry is experiencing the cyclical challenges, and that's impacting your project-based revenues this year. If you weren't seeing cyclical challenges in your project-based revenues this year, would you then be in a position for free cash flow north of $800 million? In other words,

I'm trying to get a take on to what extent the cyclical demand challenges are impairing your free cash flow power this year?

176.    Defendant Salvino replied:

So Rod, the other thing I would add to Rob's comments is we keep overlooking the operating model. So it takes most companies a year or 2 to get these operating models right. *We now are starting to see the benefits of it* because after last quarter, right, every transformation hit some bumps. But I couldn't be more proud of the execution of our team this quarter.

What that means, is we're getting to a lower level of detail than DXC has ever seen with our customers. And that detail not only produces new project work. It also makes us have the ability to manage our margins a lot better to generate more free cash flow.

So when I talk about the right model, right leader approach, to me, *that's the catalyst that we're giving to the market* at this point in time. *You're starting to see a team really starting to deliver now.* Versus being able to -- and having a consistency around hitting our financial performance.

So we don't have much more on the free cash flow. We're happy with where it is and where it's going to be, and we'll go forward from there.

177.    The statements identified in ¶¶ 116-137, 147-150, 152, and 164-176 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing

certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on top of each other" and was "*a really not fully functional organization*;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls As a result, the Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Fully Emerges

*December 20, 2023 Form 8-K*

178.   On December 20, 2023, the Company filed a current report on Form 8-K that revealed Defendant Salvino was departing as Chairman, President, and CEO of DXC effective immediately. The Form 8-K also reaffirmed DXC's FY24 guidance but only with respect to FCF. On this news, the price of DXC common stock dropped by 12.15%, or $3.04, from $25.03 per share on December 19, 2023 to $21.99 per share on December 20, 2023.

*May 16, 2024 Conference Call*

179.   The truth fully finally emerged on May 16, 2024, when the Company held an earnings conference call with analysts and investors to discuss its financial results for the fourth quarter and full year of the 2024 Fiscal Year. During the call, DXC reported that revenues dropped 5.3% in the 2024 Fiscal Year, and that the Company recorded $756 million in FCF. Also, during

the call, the Company revealed lower-than-expected guidance for the upcoming fiscal year, including FCF of only $400 million for the full year. Defendant Fernandez further revealed that the Company was "undertaking a restructuring initiative aimed at simplifying and enhancing our operational efficiency." Defendant Fernandez continued:

> We will simplify our processes, increase visibility to eliminate redundancies, reduce costs, improve resource management, and ultimately drive a more streamlined, agile and competitive organization. One specific example of this enterprise initiative is consolidating our five acquired enterprise business systems and optimizing our back-end office functions. We anticipate not only a material reduction in our operating costs but also improvements in our service delivery and responsiveness to our customers. We are also aligning our organizational structure to support streamlined operations with improved and faster decision-making. This realignment will make us more competitive.

180.    Deutsche Bank analyst, Bryan Keane, stated that "[i]t seems like every five years or so, a CEO comes in, looks at the business and restructures it," and wanted to know "how [Fernandez's] restructuring might be different than many of the CEOs that came before you that had a lot of restructuring as well." Defendant Fernandez revealed:

> I know that, as you've mentioned, in the short history of this public company, *there have been previous restructurings.* But as someone who just got here and have really spent a lot of time operationally looking at our systems, our processes, our entities, our distribution of head count, *it's clear to me that the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth*. You can look at that in multiple ways: *number of systems still in place that were acquired over time, never integrated, never deduped; number of business processes that got stacked on top of each other*; number of legal entities. I think anyone that came in would look at the previous work, and again, I know the history is there so I'm not running away from it, but *I can tell you that this is a real reset. It is bottoms up*. It is a strong foundation to go from and *it is absolutely needed because otherwise, we just continue to carry a really not fully functional organization* that can take advantage of the opportunities that we have.

181.    Then, James Faucette of Morgan Stanley asked the following: "it sounds like you feel like you have all the, or at least a majority of assets, to be able to execute and deliver that cross-sell. Is that fair? Or are there other things that you think you're going to need to add into the

mix?" Defendant Fernandez replied: "No. We have what we need to compete. We have what we need to compete profitably and grow. We have to get some internal systems aligned. We've got, *as I mentioned earlier, dedupe, streamline and do some work that should have been done before that wasn't, but we're going to get it done with speed*."

182.    On this news, the price of DXC common stock dropped by $3.36 per share, or approximately 17%, from a closing price of $19.88 per share on May 16, 2024, to close at a price of $16.52 per share on May 17, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

183.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.195 billion to repurchase approximately 81.7 million shares of its own common stock. in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $846 million.

## DAMAGES TO DXC

184.    As a direct and proximate result of the Individual Defendants' misconduct, DXC has lost and will continue to lose and expend many millions of dollars.

185.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

186.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the $8

million fine imposed on the Company by the SEC, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

187.    Such losses include the Company's overpayment of over $846 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

188.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

189.    As a direct and proximate result of the Individual Defendants' conduct, DXC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## <u>DERIVATIVE ALLEGATIONS</u>

190.    Plaintiffs bring this action derivatively and for the benefit of DXC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of DXC, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

191.    DXC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

192.    Plaintiff is, and has been at all relevant times, a shareholder of DXC. Plaintiff will adequately and fairly represent the interests of DXC in enforcing and prosecuting its rights, and,

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

193.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

194.    A pre-suit demand on the Board of DXC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Herzog, Fernandez, Barnes, Gonzalez, Racine, Rogers, Teffner, Washington, and Woods (the "Director-Defendants"), and nonparty Pinkie Mayfield ("Mayfield") (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

195.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts.

196.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

197.    Additional reasons that demand on Defendant Fernandez is futile follow. Defendant Fernandez has served as the Company's CEO and President since February 2024 and as a

Company director since August 2020. Thus, as the Company admits, he is a non-independent director. The Company also provides Defendant Fernandez with his principal occupation for which he receives handsome compensation. Defendant Fernandez was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Fernandez solicited the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions. For these reasons, Defendant Fernandez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.   Additional reasons that demand on Defendant Barnes is futile follow. Defendant Barnes has served as a Company director since August 2020. Defendant Barnes also serves as the Chair of the Nominating/Corporate Governance Committee and has been a member of that Committee since 2022 and has been a member of the Audit Committee since 2020. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Barnes has received and continues to receive substantial compensation for his role as a director as described above.  Defendant Barnes also solicited the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions. For these reasons, Defendant Barnes breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.   Additional reasons that demand on Defendant Herzog is futile follow. Defendant Herzog has served as the Chair of the Board since December 2023 and has served as a Company director since April 2017. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee since July 2022. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Herzog has received and continues to receive substantial compensation for his role as a director as described above. Defendant Herzog also solicited the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions and which led to shareholders reelecting him to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Herzog breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.   Additional reasons that demand on Defendant Gonzalez is futile follow. Defendant Gonzalez has served as a Company director since January 2023. He also serves as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Gonzalez has received and continues to receive substantial compensation for his role as a director

as described above.  Moreover, Defendant Gonzalez solicited the 2023 Proxy Statement, which contained false and misleading statements and material omissions. For these reasons, Defendant Gonzalez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Racine is futile follow. Defendant Racine has served as a Company director since January 2023. He also serves as a member of the Nominating/Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Racine has received and continues to receive substantial compensation for his role as a director as described above. Defendant Racine solicited the 2023 Proxy Statement, which contained false and misleading statements and material omissions and which led to shareholders reelecting him to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Racine breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on Defendant Rogers is futile follow. Defendant Rogers has served as a Company director since March 2021. She also serves as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Rogers also solicited

the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions. For these reasons, Defendant Rogers breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

203.    Additional reasons that demand on Defendant Teffner is futile follow. Defendant Teffner has served as a Company director since April 2022. She also serves as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Teffner has received and continues to receive substantial compensation for her role as a director as described above.  Defendant Teffner solicited the 2022 and the 2023 Proxy Statements, which contained false and misleading statements and material omissions. For these reasons, Defendant Teffner breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204.    Additional reasons that demand on Defendant Washington is futile follow. Defendant Washington has served as a Company director since March 2021. Defendant Washington also serves as a member of the Nominating/Corporate Governance Committee and as the Chair of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Washington has received and continues to receive substantial compensation for his role

as a director as described above. Defendant Washington also solicited the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions and which led to shareholders reelecting him to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Washington breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205.    Additional reasons that demand on Defendant Woods is futile follow. Defendant Woods has served as a Company director since April 2017. Defendant Woods also serves as the Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Woods has received and continues to receive substantial compensation for his role as a director as described above. Defendant Woods also solicited the 2022 and 2023 Proxy Statements, both of which contained false and misleading statements and material omissions and which led to shareholders reelecting him to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Woods breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.    Additional reasons that demand on the Board is futile follow.

207.    Defendants Woods, Barnes, Herzog, and Teffner (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for

overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, failed to ensure compliance with laws and regulations as they are charged to do under the Audit Committee Charter, and failed to prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is further excused as to them.

208.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

209.    DXC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for DXC any part of the damages DXC suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

210.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

211.    The acts complained of herein constitute violations of fiduciary duties owed by DXC's officers and directors, and these acts are incapable of ratification.

212.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of DXC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of DXC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

213.     If there is no directors' and officers' liability insurance, then the Directors will not cause DXC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

214.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

215.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

218.    Under the direction and watch of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods, the 2022 Proxy Statement failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2022 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

219.    Under the direction and watch of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods, the 2023 Proxy Statement failed to disclose that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2023 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

220.    The 2022 and 2023 Proxy Statements were also materially false and misleading because they failed to disclose that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies

into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on top of each other" and was "a really not fully functional organization;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

221.    Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors.

222.    Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of directors.

223.    The false and misleading elements of the 2022 and 2023 Proxy Statements led Company shareholders to, *inter alia*: elect certain Defendants to the Board.

224.    The Company was damaged as a result of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Krakauer, Read, Rogers, Salvino, Singh, Washington, and Woods's material misrepresentations and omissions in the 2022 Proxy Statement.

225.    The Company was damaged as a result of Defendants Aghi, Alving, Barnes, Fernandez, Herzog, Rogers, Salvino, Teffner, Washington, and Woods's material misrepresentations and omissions in the 2023 Proxy Statement.

226.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    The Individual Defendants, by virtue of their positions with DXC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of DXC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence

and exercised the same to cause DXC to engage in the illegal conduct and practices complained of herein.

229.     Plaintiff, on behalf of DXC, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

230.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.     The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding DXC. Not only is DXC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon DXC by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging DXC.

232.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

233.     The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DXC not misleading.

234.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by DXC.

235.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

236.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

237.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

238.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DXC's business and affairs.

240.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

241.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DXC.

242.    In breach of their fiduciary duties owed to DXC, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants neglected DXC's restructuring and integration needs, which caused DXC to never properly integrate its prior acquired companies into a combined functional business; (2) DXC suffered from several operational shortfalls because of the Company's failure to properly integrate its businesses, including: (a) certain of DXC's various businesses cannibalizing each other by competing for the same customers, (b) customers being given different prices by different DXC businesses for the same services, (c) certain of DXC's various businesses not receiving access to integral business documents in DXC's possession, such as customer lists, that would have grown the Company's business, and (d) DXC mothballing certain technology that inconvenienced customers; (3) DXC's Transformation Journey was not successful and DXC was not positioned to generate long-term profitable growth; (4) as a result, DXC was a "number of business processes that got stacked on top of each other" and was "a really not fully functional organization;" (5) TSI costs had not been reduced by DXC's purported success in its integration and restructuring initiatives; (6) instead, TSI costs would be further inflated and the Company would have to spend even more money to "reset;" (7) the price per share of DXC's common stock was not undervalued

but was instead grossly artificially inflated from the Individual Defendants prioritizing short-term success at the expense of sustainable growth and stability; and (8) the Company failed to maintain adequate controls. As a result, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

243. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

244. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

245. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

246. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DXC's securities.

247. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was

engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of DXC's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

248.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

249.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DXC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants for Unjust Enrichment**

251.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DXC.

253.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from DXC that was tied to the performance or artificially inflated valuation of DXC, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

254.    Plaintiff, as a shareholder and representative of DXC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

255.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

256.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

257.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DXC, for which they are legally responsible.

258.    As a direct and proximate result of the Individual Defendants' abuse of control, DXC has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

259.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

260.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

261.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DXC in a manner consistent with the operations of a publicly-held corporation.

262.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DXC has sustained and will continue to sustain significant damages.

263.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

264.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## EIGHTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

265.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

266.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

267.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused DXC to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

268.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

269.    Plaintiff, on behalf of DXC, has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Salvino, Sharp, and Del Bene for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

270.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

271.     DXC, and Defendants Salvino, Sharp, and Del Bene are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Salvino, Sharp, and Del Bene's willful and/or reckless violations of their obligations as officers and/or directors of DXC.

272.     Defendants Salvino, Sharp, and Del Bene, because of their positions of control and authority as officers and/or directors of DXC, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DXC, including the wrongful acts complained of herein and in the Securities Class Action.

273.     Accordingly, Defendants Salvino, Sharp, and Del Bene are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

274.     As such, DXC is entitled to receive all appropriate contribution or indemnification from Defendants Salvino, Sharp, and Del Bene.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of DXC, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DXC;

(c)     Determining and awarding to DXC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing DXC and the Individual Defendants to take all necessary actions to reform and improve DXC's corporate governance and internal procedures to comply with applicable laws and to protect DXC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of DXC to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding DXC restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Date: December 22, 2024

Respectfully Submitted,

**SPIRO & BROWNE, PLC**

_/s/ David G. Browne_
David G. Browne (VSB No. 65306)
Spiro & Browne PLC
2400 Old Brick Road
Glen Allen, Virginia 23060
Telephone: (804) 573-9220
Facsimile: (804) 836-1855
Email: dbrowne@sblawva.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

_Counsel for Plaintiff_